**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**MARK LEVOLA,**

|  |  |  |
|---|---|---|
| | **Plaintiff,** | **9:09-CV-0833** |
| **v.** | | |

**BRIAN FISCHER, Commissioner, New York State**
**Department of Correctional Services; GLENN GOORD,**
**Former Commissioner; LESTER N. WRIGHT, Deputy**
**Commissioner and Chief Medical Officer; LUCIEN J.**
**LECLAIRE, JR., Former Deputy Commissioner;**
**JOHN SHERIDAN, Director, Correctional Health**
**Services;** *et al.*,

**Defendants.**

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|

**MARK LEVOLA**
Plaintiff, *pro se*

| **ANDREW M. CUOMO** | **ROGER W. KINSEY, ESQ.** |
|---|---|
| New York State Attorney General | Assistant Attorney General |
| Attorney for Defendants | |

**THOMAS J. McAVOY, SENIOR JUDGE**

**MEMORANDUM-DECISION AND ORDER**

Plaintiff Mark Levola, a New York State prison inmate in the custody of the Department of

Correctional Services ("DOCS") who is proceeding *pro se* and *in forma pauperis*, commenced this

civil rights action pursuant to 42 U.S.C. § 1983 seeking damages for the alleged violation of his

constitutional rights.[1]

Currently pending is defendants' motion to dismiss pursuant to Federal Rule of Civil

---

[1] Plaintiff is presently incarcerated at Groveland Correctional Facility. By Decision and Order filed August 20, 2009, the Court denied plaintiff's motion for preliminary injunctive relief. Dkt. No. 7 at 2-5. Plaintiff appealed that ruling to the United States Court of Appeals for the Second Circuit. Dkt. No. 10. Plaintiff's appeal is pending.

Procedure 12(b)(6).  Dkt. No. 56.  Plaintiff has responded in opposition.  Dkt. No. 65.

**I.    Background**

    **A. Proceedings to Date**

    Plaintiff filed his complaint on July 22, 2009.  Dkt. No. 1.  The claims asserted in the three

hundred and three page complaint span the period April, 2004 through May, 2009, and arise out of

plaintiff's confinement at six correctional facilities under the supervision and direction of DOCS.[2]

Plaintiff claims that he has been denied proper and adequate care for his serious medical conditions

throughout his incarceration.  In addition, plaintiff claims that excessive force was used against him

by corrections staff, he was denied due process in the course of disciplinary proceedings, his

personal property was intentionally lost or destroyed, legal mail was interfered with, medical records

were improperly disclosed, and he was retaliated against for having filed grievances regarding the

conditions of his confinement.[3]  The complaint names more than forty individual defendants and

several additional defendants identified only as John/Jane Doe.[4]

_____

    [2]  The complaint is set out in consecutively numbered paragraphs up to paragraph 999, which appears on page 172.  The next paragraph is numbered "1" and the pleading continues through paragraph 690, which appears on page 271.  The Court has followed the convention used by defendants in their motion papers and has added the designation "a" to each citation of a paragraph from the second set of paragraphs (1 through 690).

    [3]  On August 14, 2009, subsequent to the filing of the complaint, plaintiff submitted voluminous exhibits in support of his complaint.  Dkt. No. 6.  Additional exhibits were submitted on August 20, 2009.  These exhibits, which consists mainly of grievance documents and medical records, total more than eleven hundred pages.  The Court has assumed for purpose of this motion, that the factual information contained in the exhibits is consistent with the allegations of the complaint.

    [4]  Forty-one individuals are identified as defendants on pages one through three of the complaint and were duly listed on the docket by the Clerk of the Court when this case was filed. Six additional corrections staff members and five medical specialists are identified as defendants later in the pleading.  Dkt. No. 1 at 7-9.  Although these individuals are not listed on the docket and

Plaintiff was granted leave to proceed with this action *in forma pauperis* and the U.S.

Marshal was directed to effect service of process on the named defendants.  Dkt. No. 7.

In lieu of an answer, defendants moved to dismiss the complaint pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure.  Dkt. No. 56.[5]  Defendants argue that the allegations of

plaintiff's complaint fail to state a claim upon which relief may be granted under the Eighth

Amendment.  Defendants also maintain that dismissal is warranted because the claims are time-

barred, the Eleventh Amendment bars plaintiff's official-capacity claims, and because they are

entitled to qualified immunity.  *See* Dkt. No. 56-1 (Memorandum of Law in Support of Defendants'

Motion to Dismiss) ("Defs. MOL").[6]

## II.    Discussion

### A.  Standard of Review Pursuant to Rule 12(b)(6)

"Generally, '[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment]

to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do.'"  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)

---

have not been served with process, the Court has considered whether the allegations of the
complaint are sufficient to state a claim against one or more of them.

[5]  As service of process was effected on additional defendants, they requested and were
granted leave to join the motion to dismiss.  *See e.g.*, Dkt. Nos. 59, 69; Text Order filed 7/8/10.

[6]  Although defendants' motion does not address all of the claims asserted in the complaint,
the Court has *sua sponte* reviewed the sufficiency of those claims.  *See* 28 U.S.C. § 1915(e) (when a
plaintiff seeks to proceed *in forma pauperis*, "(2) . . . the court shall dismiss the case at any time if
the court determines that – . . . (B) the action . . . (i) is frivolous or malicious; (ii) fails to state a
claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is
immune from such relief.").

3

(*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570) (emphasis added). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted). More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Twombly*, 550 U.S. at 555.

In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must accept the allegations of the complaint as true, and draw all reasonable inferences in favor of the nonmoving party. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995). A *pro se* litigant's papers are to be construed liberally, especially when civil rights violations are alleged. *See Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir. 2008). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S.Ct. at 1949.

4

The burden undertaken by the moving party is substantial, as the question presented by the motion to dismiss is not whether the non-moving party is likely ultimately to prevail, "but whether the claimant is entitled to offer evidence to support the claims." *Gant*, 69 F.3d at 673 (other citations omitted). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires").

### B.  Liability Under 28 U.S.C. § 1983

To prevail on a claim under § 1983, a plaintiff must show the deprivation of rights, privileges, or immunities secured by the Constitution and laws by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). The personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), and the doctrine of respondeat superior is inapplicable to § 1983 claims. *See Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

### C.  Timeliness of the Claims

The statute of limitations governing § 1983 claims arising in New York is three years. *See Owens v. Okure,* 488 U.S. 235, 251 (1989); *see also Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir. 2004). "Under federal law, which governs the [actual] accrual of claims brought under § 1983 . . . , a claim generally accrues once the plaintiff knows or has reason to know of the injury which is the basis of his action." *Cornwell v. Robinson,* 23 F.3d 694, 703 (2d Cir. 1994) (internal

quotations and citations omitted). "Thus, in determining when the statute begins to run, the proper focus is on the time of the [wrongful] act, not the point at which the consequences of the act become painful." *Covington v. City of New York*, 916 F. Supp. 282, 285 (S.D.N.Y. 1996) (internal quotations and citations omitted).

In "rare and exceptional" cases, the doctrine of equitable tolling may be invoked to defeat a defense that the action was not timely filed. *See Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir. 2007). As the Second Circuit noted in *Abbas*, New York law recognizes the equitable tolling doctrine where a plaintiff demonstrates that he was induced by fraud, misrepresentations, or deception to refrain from timely commencing an action, and that he acted with due diligence throughout the period to be tolled. *Id.*; *see also Walker v. Jastremski,* 430 F.3d 560, 564 (2d Cir. 2005). In addition, the "continuing violation" or "continuing harm" doctrine typically applied in discrimination cases brought under Title VII of the Civil Rights Act of 1964, provides that "the commencement of the statute of limitations period may be delayed until the last wrongful act in furtherance of it." *Shomo v. City of New York*, 579 F.3d 176, 180-81 (2d Cir. 2009). In *Shomo*, the Second Circuit held that "the continuing violation doctrine can apply to Eighth Amendment claims of medical indifference brought under 42 U.S.C. § 1983." *Id.* at 179. According to the Second Circuit, "[t]o assert a continuing violation for statute of limitations purposes," the plaintiff must allege (1) "an ongoing policy of deliberate indifference to his or her serious medical needs;" and (2) for each defendant, "some acts in furtherance of the policy within the relevant statute of limitations period." *Id.* at 179, 182-84.[7]

---

[7] In *Shomo*, the Second Circuit affirmed the dismissal of several defendants who had not participated in or been responsible for the plaintiff's medical care during the three year limitations period. *Id.*, 579 F.3d at 183-84. As noted in *Gonzalez v. Wright*, 665 F. Supp.2d 334, 350

Defendants seek dismissal of the complaint as time-barred insofar as it asserts claims which arose prior to July 15, 2006. Defs. MOL at pp. 14-15.[8] Defendants argue that because "[n]one of the defendants listed as being in Elmira and Greene have been involved with plaintiff since more than three years before the complaint was filed," the claims against them must be dismissed as time-barred. *Id*. at p. 15.

Plaintiff opposes the requested dismissal. Dkt. No. 65-1 (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss) ("Pl. MOL") at pp. 12-18. Plaintiff claims that his medical providers at Elmira Correctional Facility ("Elmira") and Greene Correctional Facility ("Greene") "intentionally failed their duty to provide proper essential adequate medical care, same as if Plaintiff was not incarcerated," and that this wrongful conduct has persisted throughout his confinement. Pl. MOL at p. 14. Plaintiff argues that he has been subjected to an ongoing policy of deliberate indifference to his serious medical needs since April, 2004, and may properly invoke the "continuing violation" doctrine to establish the timeliness of all of his medical care claims. *Id.*

At the outset, the Court notes that plaintiff does not claim that he was induced by fraud, misrepresentations, or deception to refrain from timely commencing an action, or that the seriousness of his medical condition was withheld from him. To the contrary, plaintiff perceived

_____

(S.D.N.Y. 2009), the dismissal of the plaintiff's claims against those individuals "made clear that in order for the continuing violation doctrine to apply, plaintiff needed to show that those specific individuals committed at least one wrongful act within the statutory time period."

[8] Defendants mistakenly identify the controlling date as "July 22." Defs. MOL at p. 14. While not relevant to the present motion, plaintiff is clearly entitled to the benefit of the "mailbox" rule, according to which he is deemed to have filed this action when he gave his complaint to prison officials for mailing. *See Houston v. Lack,* 487 U.S. 266, 273 (1988). In the absence of evidence to the contrary, the date a pleading is signed is deemed to be the date on which it was delivered to prison officials for mailing. Plaintiff signed his complaint on July 15, 2009. Dkt. No. 1 at 303.

the seriousness of his medical condition even before his DOCS confinement began and found his medical care to be inadequate from the outset. Plaintiff acknowledges that he was aware of these allegedly "unlawful acts" as they occurred, and states that he "promptly filed detailed grievances" regarding his concerns. Pl. MOL at p. 16.

The Court also finds that plaintiff does not allege in the complaint that the individuals responsible for his medical care at Elmira and Greene continued to be involved in his care after he left their respective facilities. Because plaintiff does not allege that these defendants took "some acts in furtherance of the policy within the relevant statute of limitations period," his claims against them are time-barred. *Shomo*, 579 F.3d at 179, 182-84.

The Court has also considered plaintiff's claim that the statute of limitations be tolled because the inmate clerk he relied on for assistance in the preparation of the complaint engaged in "deceitful acts loafing in typing til upon his release March 2009 and complaint was incomplete." Pl. MOL at p. 17. Plaintiff further alleges that other inmates refused to assist him "with the intent that he'd fail litigating/ processing papers to delay filing in order to sabotage." *Id.*

While mindful of the difficulties which may be encountered by inmates seeking to litigate *pro se*, the Court nevertheless finds that plaintiff has not demonstrated that this is one of the "rare and exceptional cases" where equitable tolling is warranted. *See Abbas,* 480 F.3d at 642. The statute of limitations for claims against staff at Elmira expired in May, 2007; the limitation period for claims arising out of plaintiff's confinement at Greene expired approximately one year later in July, 2008. Plaintiff states that he began work on his complaint in October, 2008, well after the expiration of the limitations period for claims arising out of his confinement at those facilities. *See* Pl. MOL at p. 17. Accordingly, the dilatory actions of his inmate assistant had no bearing on the

timeliness of that filing.

For the reasons set forth above, plaintiff's claims which arose prior to July 15, 2006, during his incarceration at Elmira and Greene, are subject to dismissal as untimely filed.  This aspect of defendants' motion to dismiss is granted.

## D.  Eighth Amendment Claims Generally

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *Robinson v. California*, 370 U.S. 660, 666-67 (1962) (cited in *Tramell v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003)).  The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment.  *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976).  Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Estelle*, 429 U.S. at 102.  The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  A viable Eighth Amendment claim must contain both an objective and a subjective component.  *Farmer*, 511 U.S. at 834.

## E.  Medical Care Claims

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, "'sufficiently

serious.'" *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154 (1995).  A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted).[9]  A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain;'" since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts.  *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting, *inter alia, Chance,* 143 F.3d at 702).  Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain."  *Chance,* 143 F.3d at 702 (citation omitted).

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment claim a plaintiff must also establish deliberate indifference to that condition on the part of the defendant(s).  *Chance,* 143 F.3d at 703.  Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."  *Farmer,* 511 U.S. at 837.

---

[9]  In *Chance*, a prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the *Estelle* standard.  *Chance*, 143 F.3d at 702, 703.  The Second Circuit held that a tooth cavity is a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated is likely to become so.  *Id*.

A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.'" *Jones v. Westchester County Dept. of Corrections*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). Thus "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs*., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Defendants urge dismissal of plaintiff's Eighth Amendment medical care claims on the ground that the allegations of the complaint evidence nothing more than plaintiff's disagreement with the medical care he has received. Defs. MOL at pp. 23-30. Defendants review, in considerable detail, the numerous medical evaluations, diagnostic procedures, and treatments prescribed over the

11

course of plaintiff's incarceration. *Id*. Defendants assert that "even if plaintiff had or has a serious medical condition, the many attempts that defendants have made to diagnose and treat plaintiff and his continued disagreement with both the diagnosis and treatment provided underscores the fact that there was no deliberate indifference, but merely disagreement with his treatment." *Id*. at 29-30.

Plaintiff opposes the motion. Dkt. No. 65. Plaintiff claims that he has been suffering from a serious medical condition since approximately January, 2004, prior to his incarceration.[10]  At that time, "plaintiff felt something pull in his left groin/abdomen region, which he hadn't realized at the time is when and where an infection stems from and gradually worsened until it was somewhat stabilized by his doctor." Dkt. No. 1 at ¶ 377. This condition was "mysterious" from the start, *id*. at p. 274 ¶ 5, and while the groin/abdomen pull initially aggravated his neck, *id*., wide-spread aches and a sense of "feeling unwell" quickly became evident. *Id*. at p. 274 ¶ 6.[11]  "The pull triggered an infection that affected other body systems and parts." *Id*. at p. 274 ¶ 7. From and after January, 2004, periods of apparent improvement have been followed by incidents which caused the "pulling sensation" to recur, and "over time [plaintiff] has never recovered to his former good health; each episode leave [plaintiff] more sickly and in pain." *Id*. at p. 276 ¶ 25. Plaintiff describes his condition as inflicting agonizing pain, and claims that it is both disabling and degenerative. Plaintiff is currently confined to a wheelchair. Plaintiff claims that this syndrome remains undiagnosed and, as a result, untreated. According to plaintiff, "[i]n spite of the same numerous complaints, plaintiff

---

[10]  Plaintiff provides a summary list of his symptoms and of the health problems he has experienced since incarceration at pages 279 through 288 of the complaint.

[11]  Although diagnosed by his private physicians as an infection and as a prostrate problem, Dkt. No. 1 at ¶¶ 65, 88, plaintiff states that the diagnosis of a prostate condition was erroneous. *Id*. at ¶ 68, Pl. MOL at p. 3.

faced nothing but a display of factitious/fictitious and non-ligament [sic] forms of medical care appointments/sick calls, and blood work results come back 'allegedly' having no major abnormalities/problems."  Pl. MOL at p. 11.

### (i) The allegations of the complaint[12]

Plaintiff was confined at Elmira during the first month of his DOCS custody, commencing April 23, 2004.[13]  Plaintiff arrived at Elmira with unresolved medical concerns stemming from the "undisclosed internal injury" he sustained in January, 2004.  Dkt. No. 1 at ¶ 63.  On April 29, 2004, plaintiff's right knee "strangely and unknowingly" struck the cell wall during the night.  *Id*. at ¶ 72.  Dr. Fowler examined plaintiff's knee and ordered x-rays.  *Id*. at ¶ 74.  Dr. Fowler admitted plaintiff to the facility infirmary for "three weeks of bed rest and medications."  *Id*. at ¶ 80.  On May 20, 2004, plaintiff was drafted out of Elmira.  *Id*. at ¶ 83.  During his transfer out of Elmira, "plaintiff reinjured the left undisclosed problem, causing him to become increasingly ill, again from an infection."  *Id*. at ¶ 88.

Plaintiff spent the next fourteen months at Greene.  Upon arrival, plaintiff was examined by Dr. Rosenfeld, and "[d]octor(s) began a cause [sic] of various treatments of medications, which includes antibiotics, but yet, the cause of the infection was never really properly diagnosed."  Dkt. No. 1 at ¶ 104.  Various diagnostic and therapeutic procedures were ordered by medical staff.

---

[12]  This information is drawn from the complaint.  The Court has also paid particular attention to plaintiff's memorandum of law in opposition to defendants' motion to dismiss, in which he sets forth several pages of "Corrections and Clarifications" to the factual summary provided by defendants.  *See* Pl. MOL at pp. 3-11.

[13]  As discussed above, claims arising out of plaintiff's confinement at Elmira Correctional Facility and Greene Correctional Facility appear time-barred.  Nevertheless, because that dismissal is without prejudice, the Court has reviewed the sufficiency of plaintiff's claims.

Plaintiff underwent a colonosopy, in August, 2004.  *Id*. at ¶ 107.  In November, 2004, plaintiff was diagnosed with a right side hernia.  Dr. Valerian told plaintiff there was nothing wrong with his left side, yet that is where the "terrible" pain is.  *Id.* at ¶ 114.  A hypomastic nerve block was done on February 11, 2005.  *Id*. at ¶ 131.  In August, 2005, plaintiff was referred for physical therapy.  *Id*. at ¶ 138.  In the latter part of  2005, left hip pain developed and plaintiff began "to experience a clunk to the left hip area." *Id*. at ¶ 171.  Plaintiff underwent a MRI of his left knee in September, 2005; hip x-rays in October, and a CT scan of his neck, back and hip in December, 2005.  *Id*. at ¶¶ 139, 173, 174.  Plaintiff was referred to a specialist for evaluation of his persistent nasal problems in January, 2006, *id*. at ¶ 179;[14] C-reactive protein tests were conducted in March and April, 2006, *id*. at ¶¶ 209-18; plaintiff received an orthopedic evaluation in May, 2006, *id*. at ¶ 236; and another MRI of the left hip was done in June, 2006, *id.* at ¶ 239.  In addition to the foregoing, plaintiff was evaluated at sick call on numerous occasions and various treatments were prescribed.

According to plaintiff, "Greene Correctional Facility is mainly held accountable for my severe deteriorated health, other facilities thereafter continued the intentional denial of providing adequate treatment for serious medical needs."  Dkt. No. 1 at ¶ 94.  Although plaintiff acknowledges various "improvements" in his condition during this period, "absolutely no credit [is owed] to Greene's facility doctors at all.  Plaintiff owes himself the credit for this accomplishment and stands by on what he has done for himself." *Id*. at ¶ 232.

Plaintiff arrived at Riverview Correctional Facility ("Riverview") on July 14, 2006, and was admitted to the infirmary.  Dkt. No. 1 at ¶ 249.  Dr. Seidman evaluated plaintiff on July 16, 2006

---

[14]  This doctor was not interested with plaintiff's "ongoing left sided issues, an infection, rectal bleeding and so forth," but did prescribe a nasal spray.  Dkt. No. 1 at ¶ 179.

and advised plaintiff that he had some "ligament/tendon tears of the left hip region." *Id*. at ¶ 254.

Dr. Seidman placed him "on medical leave, plus physical restrictions on activities, indefinitely." *Id*.

at ¶ 253.

While at Riverview, certain symptoms, "especially the body symptoms and sensations along

with the intense burning pain of left abdomen region," became more intense, and plaintiff addressed

his medical complaints through sick call. *Id*. at ¶¶ 256-57.  On August 6, 2006, plaintiff was sent to

Clinton Correctional Facility for an emergency mental health evaluation. *Id*. at ¶ 257.[15]  Following

his return to Riverview, Dr. Seidman told plaintiff that he could give him a better medication for

pain than he had been previously been prescribed. *Id*. at ¶ 283.  Plaintiff discontinued the

medication after taking one dose, because it left him feeling "tired, groggy, [and] unsteady." *Id*. at ¶

287.  Dissatisfied with Dr. Seidman's "ill-mannered behavior," plaintiff requested that his care be

transferred to a different facility doctor.  *Id*. at ¶ 303.

On September 1, 2006, plaintiff received an orthopedic evaluation by Dr. Perrier.  Dkt. No. 1

at ¶ 290.  Nurse Jones was present during this evaluation.  Plaintiff "feels nurse L. Jones placed

someone else's x-rays with similar bone frame who has no hip issues . . . so the Dr. would not see

that plaintiff had anything wrong to the left hip region." *Id*. at ¶ 292.  Plaintiff further alleges that

Dr. Perrier failed to hear the clunk in his left hip, even though plaintiff heard it and felt it. *Id.* at

¶ 299.

Dr. Chalom evaluated plaintiff's left knee on November 3, 2006, and recommended an

---

[15]  Plaintiff's mental health status was determined to be "okay." *Id*. at ¶ 277.  According to plaintiff, the driver of the transport van slammed on the brakes while exiting a gas station. *Id*. at ¶ 260.  After that incident, plaintiff's "serious neck condition has severely worsened." *Id*. at ¶ 266.

examination by a specialist.  Dkt. No. 1 at ¶ 319.[16]  Plaintiff saw Dr. Chalom again in April, 2007.  *Id*. at ¶ 458.  Plaintiff expressed his deep concerns about rectal bleeding; according to plaintiff the "real culprit" for his rectal and nasal bleeding "is an infection that stemmed from the left groin/abdomen issues which initially is where a mysterious pull was felt first week in 2004."  *Id*. at ¶ 454.  Dr. Chalom advised plaintiff that the stool sample tests were negative.  *Id*.  Even so, a rectal medication was prescribed to "supposedly suppress the rectal bleeding."  *Id*. at ¶ 462.  Plaintiff claims that this medication aggravated his condition and moreover, surmises that Dr. Chalom prescribed the medication not to aid his condition but rather in an attempt to prove that plaintiff was lying about his rectal bleeding (which he was not).  *Id*. at ¶¶ 463-69.

Plaintiff continued to address his medical concerns at sick call.  Dkt. No. 1 at ¶¶ 519-20.  In mid-June, 2007, plaintiff met with his counselor to discuss his participation in a "required program related to his alleged offense."  *Id*. at ¶ 521.  Plaintiff advised Nurse Administrator Hunter that it would be "unbearable" to sit through the program.  *Id*. at ¶¶ 521, 524.[17]  Plaintiff believes that medical staff purposely attempted to "discredit plaintiff's medical complaints" and make him out to be a "malingerer" whose only purpose was to be excused from program.  *Id*. at ¶ 546.

Dr. Chalom again addressed plaintiff's "rectal/anus bleeding and other issues" on July 3,

---

[16]  Although expecting that examination to occur at Riverview, plaintiff states that he was scheduled for an outside trip in December, 2006.  Plaintiff further states that this trip did not take place because on the morning thereof he was discovered to have a cut on his face of unknown origin, which required investigation.  *Id*. at ¶¶ 328-54.  Because plaintiff also states that "security suspected plaintiff had a confrontation with another inmate" and removed him from the housing unit under the ruse of an outside medical trip in order to protect him, *id*. at ¶¶ 331, 349, 354, the facts regarding this trip are, at best, unclear.

[17]  Dr. Seidman renewed permits for back supports and a donut cushion.  Dkt. No. 1 at ¶ 550.

2007. Dkt. No. 1 at ¶ 557. Dr. Chalom said the stool test was negative but provided plaintiff with a container in which to collect a sample. *Id*.

Plaintiff was evaluated by Dr. Bazaz on July 16, 2007. Dkt. No. 1 at ¶ 576. Although plaintiff found Dr. Bazaz to be "very concerned and sympathetic," unlike the other physicians, dkt. no. 1 at ¶ 585, he claims that Nurse Kenny was able to improperly influence the doctor's decision-making. *Id*. at ¶¶ 598, 600, 602, 603.

Plaintiff's final visit to the Riverview infirmary was on July 24, 2007. On that date, plaintiff undertook to "substantiate his bleeding issue." Dkt. No. 1 at ¶ 615. Plaintiff states that he prepared a "specimen with anal blood and having a faint smear of fecal matter on tissue" and brought this sample "securely wrapped several times with clear food grade plastic cling wrap and then enclosed in a sealed white envelope" to sick call. *Id*. at ¶ 620. Plaintiff received a misbehavior report and spent the remainder of his time at Riverview in the special housing unit. During this time, plaintiff's medical concerns were addressed by medical staff at his cell. *Id*. at ¶ 730.[18] Plaintiff undertook to provide another tissue sample August 1, 2007; this sample was rejected by Nurse Jones, who told plaintiff that it was not what was asked for. *Id*. at ¶ 767.

Plaintiff arrived at Gouverneur Correctional Facility ("Gouverneur") on August 9, 2007 to serve a sentence of disciplinary confinement, and remained at that facility for four months. Dkt. No. 1 at ¶ 864, 85a. While at Gouverneur, plaintiff was evaluated by medical staff on a regular basis.[19] Blood tests were performed, plaintiff's request for a high fiber diet was granted, three stool tests

---

[18] Plaintiff received a mental health evaluation at Clinton on July 27, 2007. Plaintiff was found not to have mental health issues. Dkt. No. 1 at ¶¶ 744-48.

[19] According to plaintiff he submitted fifteen sick call slips between August 28 and October 25, 2007. Dkt. No. 1 at ¶ 902.

were conducted, a donut seat cushion was provided, x-rays were taken, and a backboard and extra pillow were approved. *Id*. at ¶¶ 905-946, 23a.[20]

During this period, Dr. Sturtz concluded that wearing a back brace was not improving plaintiff's condition. According to plaintiff, Dr. Sturtz told him that "'They really don't help', 'If anything, they only make things worse'." *Id*. at ¶ 917. Plaintiff disagrees with Dr. Sturtz, who also "discredited" his request that "corrective and reconstruction surgical procedures be performed. For the neck, back, left hip/knee and left groin/abdomen region, along with others needing surgery." *Id*. at ¶ 913. According to plaintiff, he and Dr. Sturtz "don't see eye to eye." *Id*. at ¶ 23a.

Plaintiff had a serious health set back on November 15, 2007, when he "experienced such extreme pain to the left groin/crotch region which permitted him from bearing weight on left leg, and was also painful in moving it." *Id*. at ¶ 54a Plaintiff was examined by Dr. Chalom on November 24, 2007. *Id*. at ¶ 66a.

Plaintiff arrived at Gowanda Correctional Facility ("Gowanda") on December 7, 2007. Dkt. No. 1 at ¶ 111a.[21] Plaintiff received regular medical evaluations during his five months at Gowanda. On January 7, 2008, while struggling up the stairs to return to his housing unit, he "felt the certain pull recur to his left side." *Id*. at ¶ 184a. Plaintiff was examined by Dr. Bangsil on January 15, 2007 and an orthopedic consultation was scheduled. *Id*. at ¶ 198a. Another exacerbating event

_____

[20]  The stool blood tests were reported to be negative. Because plaintiff knows that he placed blood on the test card, he considers the suggestion from the nurse that the blood might have had another source to have been an admission that the test was positive and, moreover, that the results were falsified in his health records. *See* Dkt. No. 1 at ¶ 943.

[21]  According to plaintiff, "[Gowanda] was unimaginable, there were many huge buildings, two of which were seven stories and discovering how wide spread everything is such as for receiving outside packages, medical unit and so forth." *Id*.

occurred on January 22, 2008.  When plaintiff turned from the sink in the washroom, "[i]nstantly excruciating pain came to left groin/crotch, as well as abdomen region and with terrible pain down inner thigh of leg."  *Id*. at ¶ 222a.  Plaintiff was taken by stretcher to the prison hospital, and then to an outside hospital for x-rays.  *Id*. at ¶ 230a.[22]

In the months following this incident, plaintiff was moved off of bed rest to a wheelchair, from the wheelchair to crutches, and then from crutches to a cane.  Plaintiff disagrees with these determinations and also takes issue with notations in his records by medical staff which indicate that he was making progress in his recovery.  *See* Dkt. No. 1 at ¶¶ 246a -282a, 340a.[23]  Plaintiff was discharged from the Gowanda hospital and returned to the general population on March 4, 2008.  *Id*. at ¶ 450a.  Dr. Bozer placed plaintiff on full medical restrictions.  *Id*. at ¶ 464a.

Plaintiff continued to receive frequent medical evaluations and further diagnostic studies were performed.  A nerve study test was performed on March 10, 2008 at Erie County Medical Center, and plaintiff had a MRI of his lower back at Wende Correctional Facility ("Wende") on April 12, 2008.  *Id*. at ¶¶ 513a, 558a.  Physical therapy was ordered but was unsuccessful and, according to plaintiff, inappropriate to his condition.  *Id*. at ¶ 378a.  Plaintiff also made further attempts to establish the severity of his rectal bleeding, but claims that these efforts were

---

[22]  Later that evening, plaintiff participated in a tel-med interview with a physician at Erie County Medical Center.  Plaintiff recounted the events of the day and also explained his "long-lasting undisclosed form of infection.  Which it stemmed from when a pull felt to the left groin/abdomen region in Jan. 2004.  He also mentioned some symptoms and bleeding issues that's been going on since around Sept. of 2004."  *Id*. at ¶ 232a.

[23]  On February 4, 2008, Nurse Wittney noted in plaintiff's AHR that he was able to bear weight on his legs. Dkt. No. 1 at ¶¶ 272a-277a.  Plaintiff believes that medical staff "doesn't feel his pain."  *Id*. at ¶ 340a.

discredited.  *Id*. at ¶ 423a.[24]  On March 3, 2008, plaintiff was sent to Wende for a mental health evaluation.  *Id*. at ¶ 440a.

Plaintiff was transferred to Groveland Correctional Facility ("Groveland") on May 1, 2008.  Dkt. No. 1 at ¶ 576a.  Plaintiff's first three weeks at Groveland were spent in the facility hospital.  *Id*. at ¶ 581a.  On June 5, 2008, the Deputy Superintendent approved plaintiff's request for a wheelchair and "reasonable accommodations."  *Id*. at ¶ 604a.[25]  A neck brace was ordered by Dr. Jun on July 11, 2008.  *Id*. at ¶ 621a.  Dr. Jun reviewed the nerve study results with plaintiff in August, 2008 and advised that the test revealed some neuropathy in the lower extremities.  Dr. Jun advised plaintiff that he does not have diabetes or prostate issues.  *Id*. at 624a.  "Plaintiff knows that all of his medical issues stem from the infection that ravaged his body, beginning in April 2004 and continuing until mid 2006."  *Id*.

Plaintiff's counselor and Dr. Dar both wanted plaintiff to take his required program but plaintiff felt that it would be impossible due to the "pain and discomfort he experiences sitting for any length of time."  Dkt. No. 1 at ¶ 635a.[26]  More blood tests were conducted, plaintiff had a colonoscopy, an elastic back support and a donut seat cushion were provided.  Plaintiff also received a neurological evaluation in February, 2009.  Plaintiff told the doctor about the "'pricky'" feelings in one part of his body when an other part is touched . . . ."  *Id*. at ¶ 642a.  Dr. Paroski (not a

_____

[24]  Plaintiff alleges that on March 2, 2008, he showed Nurse Kibbler his toilet and complains that she made entry in his medical records AHR indicating that the red substance did not appear to be blood.  Dkt. No. 1at ¶ 425.

[25]  Lacking a person to push his wheelchair, plaintiff asked to receive his meals in his cell.  Plaintiff also requested that "soft wheels" be put on the wheelchair "to avoid jarring motion on Groveland C.F.'s uneven surfaces which causes great pain."  *Id*. at ¶¶ 613a, 619a.

[26]  It appears that plaintiff completed a program in early 2009.  *Id*. at ¶ 674.

defendant) told plaintiff that "his blood work was fine so there was nothing more to be done." *Id*. at 642a. Plaintiff underwent a colonoscopy on March 9, 2009. *Id*. at ¶ 670a. In April 2009, plaintiff was evaluated for "black specs" in his right eye and a pimple on the inside corner of his left eye. *Id*. at ¶ 679a. On May 3, 2009, plaintiff had a persistent nose bleed. Nurse Hall told him that nose bleeds are not unusual. *Id*. at ¶ 686a. Plaintiff, however, believes that his nose bleeds "are result of inflamed veins resulting from a serious persistent and neglected form of infection which caused, and continues to cause a vast amount of harm to plaintiff." *Id*. at ¶ 688a.

As alleged in the complaint, "[i]n the period from August, 2008 to the end of March 2009 plaintiff had many medical appointments and blood work done. All of this was done to discredit plaintiff's health claims and not for any real medical diagnosis or treatment and to discredit plaintiff's claim seeking recovery for medical malpractice filed upon the Court of Claims." Dkt. No. 1 at ¶ 689a.

### (ii) Sufficiency of plaintiff's claims

In considering whether plaintiff's medical care claims are sufficient to withstand dismissal under Rule 12(b)(6), the Court has accepted the allegations of the complaint as true, and has drawn all reasonable inferences in favor of plaintiff, as the nonmoving party. Plaintiff alleges that he suffers from "a serious deteriorating plague condition which resulted ruining plaintiff's whole bodies health." Dkt. No. 1 at ¶ 448a. For purposes of this motion only, plaintiff's medical condition is deemed to be sufficiently serious to satisfy the objective element of the required Eighth Amendment analysis. Accordingly, the issue presented by defendants' motion to dismiss is whether plaintiff has alleged facts in support of his claim that one or more of the defendants acted with deliberate indifference to his serious medical needs which are sufficient to make that claim

21

"plausible" and not merely speculative.  For the reasons set forth below, the Court finds that he has

not, and hereby grants this aspect of defendants' motion to dismiss.

As the foregoing summary of the complaint makes clear, plaintiff's medical history is

extensive.  Since he entered DOCS custody in April, 2004, plaintiff has received ongoing evaluation

and treatment for his various medical concerns at each of the six correctional facilities in which he

has been confined.  As set forth above, the complaint makes reference to innumerable tests and

procedures which were performed at the direction of his medical providers in order to diagnose and

treat his condition.  In addition to medical care provided at his facilities, both at sick call and as an

infirmary patient, plaintiff was evaluated on several occasions by outside specialists.

As defendants correctly recognize, a plaintiff's disagreement and/or dissatisfaction with the

medical care provided is not actionable under § 1983.  *See* Defs. MOL at p. 23.  "So long as the

treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give

rise to an Eighth Amendment violation."  *Chance*, 143 F.3d at 703.  In this case, while plaintiff

disagrees with certain of the decisions made by his treating physicians and is clearly disappointed by

the lack of a diagnosis and treatment regimen to alleviate his symptoms, the complaint as drafted is

devoid of factual allegations which even suggest that his medical providers were deliberately

indifferent to his serious medical needs.  Plaintiff claims that his medical providers failed to take

him seriously; did not recognize the seriousness of his condition, and/or made treatment decisions

that differed from plaintiff's beliefs about what would be most efficacious to his well-being.

Against the backdrop of plaintiff's medical history, these allegations are patently insufficient to

show that medical staff acted with "culpable recklessness," or that they evinced a "conscious

disregard of a substantial risk of serious harm" to his health.  *See Hathaway*, 99 F.3d at 553.

This conclusion is not altered by plaintiff's claims that false or misleading entries which minimized the severity of his condition were made in his medical records, or that x-rays and test results were somehow tampered with in order to prevent diagnosis and treatment of his condition. The filing of a false entry in medical records, without more, does not constitute a constitutional violation. *Bloomfield v. Wurzberger*, 08-CV-0619, 2009 WL 3335892, *5 (N.D.N.Y. Oct. 15, 2009) (GLS/RFT); *Benitez v. Locastro*, 2008 WL 4767439, at *11 (N.D.N.Y. Oct. 29, 2008). Moreover, these allegations are not supported by facts sufficient to "raise a right to relief above the speculative level [to a plausible level]." *Twombly*, 550 U.S. at 555.

In sum, plaintiff claims that his health has deteriorated since January, 2004 when he first felt the "left side pull in the left groin/abdomen region." Over the years, although he has received extensive medical evaluation and treatment, his symptoms persist. However, plaintiff's claim that his medical providers acted with the requisite culpable mental state of deliberate indifference toward his serious medical needs is wholly conclusory, and cannot withstand scrutiny under Rule 12(b)(6).

Accordingly, this aspect of defendants motion is granted.

**F. Dental Care Claims**

Plaintiff's dental problems began in October, 2004, when a piece of tooth "chipped off." Dkt. No. 1 at ¶ 478. Plaintiff refused to have the tooth extracted at that time and the tooth was filled in December, 2004. *Id*. at ¶ 481. In May, 2007, the dental problem "resurfaced" with the same tooth when another piece broke off and the filling fell out. *Id*. at ¶ 482. Plaintiff was evaluated by the Riverview dental department on June 13, 2007. The dentist told plaintiff that a root canal was required to save the tooth, but since that procedure was not offered at Riverview, the dentist wanted to extract the tooth. *Id*. at ¶ 485. Plaintiff again refused extraction, because the tooth "mates with

bottom tooth for chewing food well." *Id.* In April, 2009, plaintiff had a dental appointment and again sought treatment for that same tooth, this time from the dental staff at Groveland. Dkt. No. 1 at ¶ 676a. According to plaintiff he was prescribed penicillin and again advised that the only procedure available was extraction of the affected tooth. *Id.* at ¶ 677a.

Plaintiff claims that the refusal to perform a root canal procedure constitutes deliberate indifference to his serious dental needs in violation of the Eighth Amendment.[27]

As discussed above, to establish a civil rights violation based on deliberate indifference to a prisoner's healthcare needs, it is not enough to show that the prisoner was not provided optimum or even recommended treatment. Rather, the treatment must be inadequate. *Chance*, 143 F.3d at 703. Thus, courts have held that a refusal to provide recommended root canal therapy to an inmate does not constitute deliberate indifference for purposes of the Eighth Amendment where extraction of the affected tooth was offered. In *McLaughlin v. UMass Correctional Health*, 2006 WL 1709433, *4 (Mass. Super. Apr. 26, 2006), the dentist advised the plaintiff that although root canal and a post and crown would be the recommended course of treatment for his damaged front tooth, the protocol for dental care in Massachusetts state prison did not permit that treatment. The plaintiff was offered extraction and received ongoing treatment as needed for continuing symptoms. Plaintiff refused extraction, and filed a lawsuit. Upon review, the court granted summary judgment dismissing the Eighth Amendment claim, finding that nothing in the record established that extraction would not have sufficed to prevent or remedy any pain or infection resulting from the broken tooth, and to avoid any disability. *Id.* In *Jarvis v. Pullman*, 297 A.D.2d 842, 747 N.Y.S.2d 126 (3d Dept. 2002)

---

[27] Defendants do not address this claim in their motion papers other than to note (mistakenly) that plaintiff refused to have a root canal procedure on his damaged tooth. Defs. MOL at p. 8.

an inmate brought a petition pursuant to New York CPLR Article 78 challenging the denial of his

request for root canal procedures on three posterior teeth.  The petitioner had been advised that these

teeth were severely decayed and required either extraction or root canal therapy and crowns.

Petitioner's request for root canal therapy had been denied based upon DOCS dental policy which

allowed root canal procedures only for front teeth.  *Id.*, 297 A.D.2d at 843.  Petitioner refused

extraction.  On appeal, the Appellate Division, Third Department, affirmed the denial of the Article

78 petition and noted, moreover, that had petitioner's Eighth Amendment claim been preserved for

appeal, it would have been denied as lacking merit.  *Id.* at 843.

Plaintiff's claim that he was refused "adequate" treatment for his damaged tooth, as drafted,

fails to state a claim upon which relief may be granted and is subject to dismissal pursuant to Rule

12(b)(6).  First and foremost, plaintiff does not identify and has not named as defendants, the

dentist(s) allegedly responsible for the alleged violation of his Eighth Amendment rights.

Moreover, plaintiff has failed to allege anything more than his disagreement with the available

treatment.  The mere fact that he would prefer to have a root canal is without constitutional

significance.

Based upon the foregoing, plaintiff's claim that he was denied proper and adequate dental

care in violation of his Eighth Amendment rights is dismissed.

### G.  Excessive Force

To validly assert a violation of the Eighth Amendment through the use of excessive force, an

inmate must prove subjectively, that the defendant acted wantonly and in bad faith, and objectively,

that the defendant's actions violated "contemporary standards of decency."  *Blyden v. Mancusi*, 186

F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillan*, 503 U.S.

1, 8 (1992)).  Regarding the objective element of the Eighth Amendment analysis, it is well-settled

that " a *de minimis* use of force will rarely suffice to state a constitutional claim[.]" *Romano v.*

*Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).  In that respect, "[n]ot every push or shove, even if it

may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional

rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (quoted in *Hudson*, 503 U.S. at 10).

However, the malicious use of force to cause harm constitutes an Eighth Amendment violation *per*

*se* because in such an instances "contemporary standards of decency are always violated." *Blyden*,

186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9).  For example, "when a prison guard applies force

against a prisoner that poses no reasonable threat simply because the guard loses his or her temper

and wishes to wantonly inflict pain on the prisoner, a *per se* violation of the Eighth Amendment

occurs." *Beckford v. Portuondo*, 151 F. Supp.2d 204, 216 (N.D.N.Y. 2001) (citation omitted).[28]

    Plaintiff claims that Correction Officer Bellinger used unnecessary excessive force against

him in violation of his Eighth Amendment rights on July 24, 2007, at Riverview.  Defendants urge

dismissal of this claim under Rule 12(b)(6).  Defs. MOL at pp. 30-32.  Defendants' contend that

plaintiff has alleged a use of force that was at most *de minimis* and is, therefore, subject to dismissal.

*Id*.

    Plaintiff opposes the motion and argues that this claim as alleged, is sufficient to withstand

---

[28]   The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson*, 481 F.2d at 1033.  To determine whether a defendant acted maliciously, several factors must be examined, including "the extent of the injury and the mental state of the defendant, as well as 'the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.'" *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (quoting *Romano*, 998 F.2d at 105).

dismissal pursuant to Rule 12(b)(6).  Pl. MOL at pp. 35-38.

As alleged in the complaint, C.O. Bellinger escorted plaintiff to the "viewing room" so that plaintiff could inspect his property before it was packed for transfer.  Dkt. No. 1 at ¶ ¶ 659-62. After twenty minutes or so, C.O. Bellinger urged plaintiff to finish up.  *Id.* at ¶ 671.  Shortly thereafter, as plaintiff was reviewing the property transfer list, C.O. Bellinger "abruptly began the use of violent excessive physical force upon plaintiff's person."  *Id.* at ¶ 677.  Plaintiff alleges that C.O. Bellinger "grabbed plaintiff behind the neck and by the right arm," and "yanked and practically dragged plaintiff out of the room."  *Id.* at ¶¶ 681-82.  Plaintiff states that he was "shakened [sic], jerked and thrashed around like a rag-doll," and that he experienced "terrible pain, to left groin/abdomen region, the back, neck and the left knee."  *Id.* at ¶¶ 686, 688.[29]  Plaintiff was handcuffed throughout this incident.  *Id.* at ¶ 680.  The "malicious attack" is claimed to have left a red ring around plaintiff's arm and to have "severely worsened the existing medical issues he's made complaints about."  *Id.* at ¶ ¶ 697-99.  C.O. Bellinger is alleged to have ignored plaintiff's request for medical attention.  *Id.* at ¶ 696.  According to plaintiff, Nurse Jones completed a report regarding this incident and documented plaintiff's injuries.  *Id.* at ¶ 705.

Upon review, the Court finds that plaintiff has alleged facts sufficient to withstand dismissal pursuant to Rule 12(b)(6).  As pleaded by plaintiff, C.O. Bellinger unnecessarily and maliciously used force against him while he was handcuffed, in an incident which lasted for more than a brief moment and which caused injury.  *See Tafari v. McCarthy*, 07-CV-654, 2010 WL 2044705, *18- *19 (N.D.N.Y. May, 24, 2010) (DNH/GHL) (denying summary judgment on excessive force claim

---

[29]  Plaintiff alleges that C.O. Bellinger took advantage of fact that there are no cameras in the area of the prison where the incident occurred.  *Id.* at ¶ 726.

where alleged assault lasted between a minute and a half and three minutes; fact that injuries were *de minimis* does not foreclose consideration of whether the force was wanton, as to which a question of fact existed).[30]

Therefore, defendants' motion to dismiss is denied on this claim.  In so ruling, the Court draws no conclusions about the truth of plaintiff's allegations or about the strength of the evidence he might offer to corroborate them, as the question presented by the motion to dismiss is not whether the non-moving party is likely ultimately to prevail, "but whether the claimant is entitled to offer evidence to support the claims." *Gant*, 69 F.3d at 673 (other citations omitted).  The Court holds only that plaintiff's complaint says enough to require an answer from defendant C.O. Bellinger.

### H.  False Misbehavior Report

Standing alone, the mere allegation that a false misbehavior report has been filed against an inmate does not implicate constitutional conduct. *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988).[31]

As discussed earlier, plaintiff received a Tier III disciplinary ticket on July 24, 2007, after he brought a "tissue sample" to the Riverview infirmary.  Plaintiff alleges that Nurse Jones "lied about

---

[30]  The Court notes that all but one of the cases relied upon by defendants in seeking dismissal were decided on motions seeking dismissal and summary judgment, and included additional record evidence regarding the incident. *See* Defs. MOL at pp. 31-32.

[31]  The further assertion that the false misbehavior report has been prompted by retaliatory animus and relates to an inmate having engaged in protected activity, however, suffices to state a claim for retaliation. *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).

this entire encounter" in the misbehavior report. *Id*. at ¶¶ 616, 635.[32]  Plaintiff also alleges that Gowanda Nurse Kibler issued him a false misbehavior report on February 8, 2008.  Nurse Kibler charged plaintiff with not having a valid medical permit for the knee supports he was using.  *Id*. at ¶¶ 304a-05a.[33]

These claims, as alleged in the complaint, are not cognizable under § 1983 and are dismissed.

### I. Due Process

To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995).  This standard requires a prisoner to establish that the confinement imposed "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin*, 515 U.S. at 483; *see also Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir. 1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996).

Plaintiff alleges that Capt. Coryer denied plaintiff due process when he presided over his disciplinary hearing on August 3, 2007.  This Tier III hearing was held to address the misbehavior charges placed against plaintiff after he brought the tissue sample to sick call.  The hearing was originally scheduled for July 31, 2007 but was twice adjourned because plaintiff had not been

---

[32]  Plaintiff further alleges that Nurse Administrator Hunter and "several selected staff and officials" participated "in a plot to carry out to impose a bogus misbehavior charge upon plaintiff." *Id*. at ¶ 422.  The fact that plaintiff considered this behavior report to have been "conspiratorial" does not alter the fact that a false misbehavior report is not a constitutional violation.  The Court notes, moreover, that vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed.  *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-25 (2d Cir. 2002).

[33]  Plaintiff later pleaded guilty to this charge because he did not have his permit with him at the hearing and determined that the trip back to his unit to get the permit would be too difficult. Dkt. No. 1 at ¶ 501a.

provided with copies of requested documents. *See* Dkt. No. 1 at ¶¶ 782-89.  According to plaintiff, even though Capt. Coryer knew that the hearing had not been commenced in a timely fashion, he "deliberately imposed a severe penalty solely for the purpose to apply additional cruel and unusual punishment upon the plaintiff as revenge, to disturb his regimen and disregarding his serious ongoing medical conditions." *Id*. at ¶ 777.  Plaintiff further alleges that Capt. Coryer adopted a "rough attitude toward plaintiff" and was "partial and biased in the matter." *Id*. at ¶ 789. At the conclusion of the hearing, plaintiff was found guilty.[34]

Plaintiff was transferred to Gouverneur on August 9, 2007, and was confined in disciplinary segregation at that facility until October 17, 2007.  Dkt. No. 1 at ¶ 433.  Plaintiff states that his confinement in the Gouverneur SHU was "unfortunate" because he was not well and his "special form of diet and convalescing regimen as he tried to maintain prior to the malicious events on July 24, 2007, has worsened some issues more than others, especially to the whole low left quarter." *Id*. at ¶¶ 830, 832.

Accepting the allegations of the complaint as true, the Court nevertheless finds that plaintiff has not adequately alleged that his period of disciplinary confinement imposed "atypical and significant" hardship on him.  Plaintiff's confinement lasted approximately 78 days.  Courts in this Circuit routinely hold that an inmate's confinement in special housing for 101 days or less, absent additional egregious circumstances, does not implicate a liberty interest. *See Alvarado v. Kerrigan*, 152 F.Supp.2d 350, 355 (S.D.N.Y. 2001) ("the cases show a consensus in this Circuit that an inmate's confinement in the SHU for 101 days or less – without further deprivation – does not

---

[34]  The disciplinary determination was administratively reversed on October 17, 2007, upon a finding that the hearing had not been commenced within the applicable time limitations.  Dkt. No. 1 at ¶ 799.

constitute an atypical or significant hardship;" 93-day SHU does not suffice); *see also Tookes v. Artuz*, 00CIV4969, 2002 WL 1484391 *3 (S.D.N.Y. Jul. 11, 2002) (96 days is less than the 101 days of SHU confinement the Second Circuit has previously found not to constitute an atypical and significant hardship); *Sealey*, 997 F.Supp. at 319 (152-day SHU); *Trice v. Clark*, No. 94 Civ. 6871, 1996 WL 257578, at *3 (S.D.N.Y. May 16, 1996) (150-day SHU).[35]

The Court also finds that plaintiff has not alleged conditions that elevate his confinement to the level of deprivation required under *Sandin.* Without question, plaintiff found SHU confinement to be uncomfortable and disruptive to his personal regimen. In addition to experiencing the adverse effects of a "too firm" mattress, plaintiff found it difficult to maintain his optimum reclining position because he was allowed very few items of personal property and had little to work with in fashioning a back rest for himself. *See* Dkt. No. 1 at ¶¶ 838- 60. On the other hand, plaintiff acknowledges that having services at his cell door was "of benefit." *Id*. at ¶¶ 862-63. During his period of SHU confinement, plaintiff wrote lots of sick call slips, *see id.* at ¶ 902, received the high fiber diet he requested, underwent blood tests and stool occult blood tests, and was evaluated by Dr. Sturtz. *See id.* at ¶¶ 905, 908, 924. Upon due consideration, the Court finds that these allegations do not depict conditions of confinement which are "egregious" or "onerous" or otherwise sufficient to satisfy the requirements of *Sandin.*

---

[35]  In *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000), the Second Circuit discussed whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. The court concluded that 305 days in SHU would meet the standard. *Id.* at 231. Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id*. at 234. The court in *Colon* also noted that the longest confinement in SHU that did not meet the atypical requirement was 101 days. *Id*. at 231 (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999)).

Based upon the foregoing, the complaint as drafted fails to state a claim for the violation of plaintiff's due process rights upon which relief may be granted and this claim is dismissed.

### J.  Loss/Destruction of Personal Property

To prevail on a procedural due process claim under § 1983, a plaintiff must show that he "possessed a protected property interest and was deprived of that interest without due process."  *See McMenemy v. City of Rochester,* 241 F.3d 279, 285-86 (2d Cir. 2001) (internal quotation marks omitted).  Generally speaking, due process requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest.  *See DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir. 2003) (internal quotation marks omitted).  However, as recognized by the Second Circuit, "due process does not require the impossible."  *Galdamez v. Taylor,* 329 Fed. Appx. 300, 301 (2d Cir. 2009) (*quoting DiBlasio*, 344 F.3d at 302).  Thus, intentional destruction of property by state officials during random searches of prison cells is not actionable under § 1983 if a "meaningful postdeprivation remedy for the loss is available."  *Hudson v. Palmer,* 468 U.S. 517, 533 (1984).

Plaintiff alleges in his complaint that various items of personal property were lost and/or destroyed by C.O. Bellinger and C.O. Moore during plaintiff's confinement at Riverview.  According to plaintiff, on July 24, 2007, he was subjected to "a malicious deliberate act of staff misconduct by both officers, Bellinger and K. Moore for the distruction [sic] and loss of plaintiff's personal property with the intent to deprive plaintiff to have in the future."  Dkt. No. 1 at ¶ 878.  Among other belongings, plaintiff "was deprived of the most enjoyable particular item, his radio and new headphones."  *Id*. at ¶ 879.  Plaintiff states that he filed a "property loss claim" and grievances.  *Id*. at ¶¶ 810, 887.  After receiving notice that his property loss claim was denied, plaintiff appealed that determination, without success.  *Id*. at ¶¶ 161-68.

Upon review, the Court finds that this claim is also subject to dismissal.  As alleged in the complaint, a "meaningful postdeprivation remedy for the loss" was available to plaintiff and was utilized by him.  The fact that plaintiff was not successful on that claim does not give rise to a cognizable claim for the violation of his constitutional rights.

### K.  Cell Search

It is well-settled that prisoners have no legitimate expectation of privacy in their prison cell. As the Supreme Court held in *Hudson*, 468 U.S. at 525-26, "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell."

Plaintiff complains that his cell was searched on April 19, 2007, possibly by or at the direction of Sgt. Pickman, and that several items of personal property which he has possessed since 2004 were confiscated as "contraband."  Dkt. No. 1 at ¶¶ 446-49.  Plaintiff also complains that "security" searched his infirmary room at Gowanda in February, 2008.  *Id.* at ¶¶ 329a-30a.

Because plaintiff does not enjoy a constitutional right to be free from unwarranted cell searches, these claims are dismissed.  *Hudson*, 468 U.S. at 525-26; *see also Willis v. Artuz,* 301 F.3d 65, 67-69 (2d Cir. 2002); *Vega v. Artus*, 610 F.Supp.2d 185, 210 (N.D.N.Y. 2009).

### L.  Interference with Mail

The First Amendment protects an inmate's right to send and receive both legal and non-legal mail, although prison officials may regulate that right if the restrictions they employ are "'reasonably related to legitimate penological interests.'"  *Thornburgh v. Abbott,* 490 U.S. 401, 409 (1989) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)); see *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir. 2006) (holding that prisoners do have a right – albeit a limited one – to send and receive mail). Legal mail is entitled to greater protection from interference than nonlegal mail.  *See Davis v.*

*Goord,* 320 F.3d 346, 351 (2d Cir. 2003).

A single instance of mail tampering that does not result in the plaintiff suffering any damage is generally insufficient to support a constitutional challenge. *See Morgan v. Montanye*, 516 F.2d 1367, 1371 (2d Cir. 1975).[36] "Rather, the inmate must show that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.'" *Davis,* 320 F.3d at 351 (quoting *Cancel v. Goord*, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001)).

Plaintiff alleges that his legal mail was improperly interfered with on January 3, 2008, at Gowanda.  Plaintiff states that he presented two envelopes containing legal mail addressed to his attorney to "C.O. John Doe" for inspection.  Dkt. No. 1 at ¶ 174a.  In the course of processing plaintiff's request, the officer "deliberately pop-ups and reads a legal document, disregards plaintiff's privacy rights by his wrongful act." *Id*. at ¶ 183a.

Assuming as it must for purposes of this review that these allegations are true, they are not sufficient to state a claim upon which relief may be granted.  An isolated instance of mail tampering does not show, or even suggest, that prison officials "regularly and unjustifiably" interfered with plaintiff's mail.  *See Davis,* 320 F.3d at 351.  This claim is dismissed.

**M.  Privacy Rights**

The Due Process Clause of the Fourteenth Amendment protects inmates from the unwanted disclosure of health-related information.  *See Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994).  Prison officials may impinge upon that right only to the extent that their actions are

---

[36] Where an inmate alleges that the defendant's interference with his mail violated his right to access the courts, the inmate must show "that a prison official's deliberate and malicious interference caused an actual injury, such as the dismissal of a non-frivolous legal claim." *Brown v. Kepiec,* 9:06-CV-1126, 2009 WL 818959, *4 (N.D.N.Y. Mar. 25, 2009).

"reasonably related to legitimate penological interests." *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999). With respect to the disclosure of medical information, the Court notes that an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Webb v. Goldstein*, 117 F. Supp. 2d 289, 298 (E.D.N.Y. 2000). Where the medical information is spread through "humor or gossip," it is more likely that the inmate's right to privacy will have been violated. *Id.*, *Rodriguez v. Ames*, 287 F. Supp.2d 213, 220 (W.D.N.Y. 2003).

Plaintiff appears to claim that his privacy rights were violated when correspondence containing certain of his medical records was opened, first by Riverview Nurse Administrator Hunter, and thereafter by Gouverneur Nurse Administrator Bateman. Pl. MOL at p. 8.[37] According to plaintiff, his family had requested records from St. Mary's Hospital. Dkt. No. 1 at ¶ 975. However, the hospital mistakenly sent the records to plaintiff at Riverview. *Id.* at ¶ 976. Plaintiff alleges that Nurse Administrator Hunter opened the envelope and thereafter forwarded the records to Gouverneur, where plaintiff was then confined. Plaintiff claims that the records were wrongfully was addressed to the attention of Nurse Administrator Bateman at Gouverneur, who "opened wrapper exposing plaintiff's personal outside medical records." *Id.* at ¶ 978. The records were delivered to plaintiff on November 2, 2007. *Id.* at ¶ 983.

---

[37] Plaintiff also refers to the Federal Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191 ("HIPPA"), which authorizes the Secretary of Health and Human Services ("HHS") to make final regulations concerning the privacy of individually identifiable health information." *Nat'l Abortion Fed'n v. Ashcroft*, 2004 WL 555701, at *2 (S.D.N.Y. Mar. 19, 2004); 42 U.S.C. §§ 1320d - 1320d-8. However, because there is no private cause of action granted by the statute, plaintiff cannot maintain this claim pursuant to HIPAA. *See Cipriani v. Schenectady County*, No. 9:06-CV-0889, Report-Recommendation, 2009 WL 3111681, at * 9 n.13 (N.D.N.Y. Aug. 12, 2009) (Homer, M.J.), *adopted*, 2009 WL 3111681, at *1 (N.D.N.Y. Sep. 24, 2009) (Suddaby, D.J.).

Read generously and in the light most favorable to plaintiff, the complaint alleges nothing other than an instance of inadvertent disclosure of plaintiff's medical records to Nurse Administrators Hunter and Bateman. Plaintiff does not allege that either defendant made further unwarranted disclosure of the records, or that the records were disclosed for the purpose of harassment, humor, or gossip.

Accordingly, the allegations of the complaint are not sufficient to state a claim for the violation of plaintiff's privacy rights which is cognizable under § 1983.

### N. Harassment/Verbal Abuse

A claim brought under 42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir. 1986); *Gill v. Hoadley,* 261 F. Supp.2d 113, 129 (N.D.N.Y. 2003); *Aziz Zarif Shabazz v. Pico,* 994 F. Supp. 460, 474 (S.D.N.Y. 1998); *Alnutt v. Cleary,* 913 F. Supp. 160, 165-66 (W.D.N.Y. 1996) (citations omitted). Thus, mere allegations of verbal abuse do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983); *Carpio v. Walker,* No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct.15, 1997) (Pooler, J. & DiBianco, M.J.) ("[v]erbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").

Plaintiff alleges at several points in his complaint that he was subjected to harassment and verbal abuse. For example, plaintiff alleges that medical staff at Riverview "attempted to get under plaintiff's skin with all their derogatory hurtful comments . . . ." Dkt. No. 1 at ¶ 437. Plaintiff also

claims that Nurse Administrator Hunter instigated medical staff members to "aggriev[e] the plaintiff by repeatedly exhibiting hostile behavior and making vile discriminatory hurtful remarks." *Id*. at ¶ 532. Plaintiff further alleges that "[f]rom mid. July 2007, onward, plaintiff's days have become terribly more harsh due to deliberate unnecessary and wanton of the infliction of additional pain and suffering with emotional anguish which was also applied by means of hurtful comments." *Id*. at ¶ 506. Gowanda Correction Officer Lukeman is alleged to have "acted in a hostile, obnoxious manner and using hurtful language with obscenities." *Id*. at ¶ 311a.

These allegations, while neither approved nor condoned, nevertheless are not sufficient to state a claim for the violations of plaintiff's constitutional rights and are, therefore, dismissed.

### O. Retaliation

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)). The Second Circuit has cautioned that claims of retaliation are "easily fabricated" and, thus, a plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett*, 343 F.3d at 137.

The Second Circuit has defined "adverse action" in the prison context, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . .

37

constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (omission in original).  This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights.  *Id.*

Plaintiff alleges that "the events of July 24, 2007" were retaliatory in nature.[38]  Two events of significance occurred on that date.  First, plaintiff received a Tier III disciplinary ticket after he took a tissue sample to sick call in order to demonstrate his rectal bleeding.  July 24, 2007, was also the date on which C.O. Bellinger allegedly used excessive force against plaintiff.  Plaintiff appears to claim that these adverse actions were taken against him in retaliation for his having filed grievances, letters of complaint and legal actions.  Thus, plaintiff states that he received a letter from Dr. Wright on July 23, 2007, and "it instantly came to his mind and strongly believes Mr. Wright instigated the retaliatory acts upon plaintiff July 24, 2007."  *Id.* at ¶ 612.  Plaintiff further alleges that "Plaintiff feels that with his recent legal work activity has the likelihood it altered Riverview's executive team.  Therefore being another contributing factor that prompted to impose wrongful retaliatory acts upon plaintiff, especially what occurred on July 24, 2007."  *Id.* at ¶ 517.  Plaintiff also states that the incident with C.O. Bellinger "is all part of the retaliation plot against the plaintiff."  *Id.* at ¶ 726.  "All in all, there were a combination of various contributing factors that led to the retaliatory events against plaintiff on July 24, 2007."  *Id.* at ¶ 580.

Construing these allegations in the light most favorable to plaintiff, the Court nevertheless concludes that plaintiff's retaliation claim, as drafted, is conclusory in nature.  The complaint does not allege facts sufficient to demonstrate a nexus between plaintiff's constitutionally protected

---

[38]  Other allegations of retaliatory conduct are sprinkled throughout the complaint.  *See, e.g.*, Dkt. No. 1 at ¶¶ 29a - 35a; 304a-05a.  These claims are wholly conclusory in nature and do not state claims cognizable under § 1983.

activity and the adverse actions complained of.  Further, plaintiff has not alleged any facts which even suggest that Nurse Jones or Correction Officer Bellinger were aware of his protected activity, or that their actions were motivated by retaliatory animus.

Based upon the foregoing, the complaint does not state a cognizable retaliation claim and these claims are dismissed.

### P.  Personal Involvement

As the Supreme Court stated in *Iqbal*, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S.Ct. at 1948.  Thus, in order to state a claim upon which relief may be granted, a plaintiff must allege "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

In *Williams v. Smith*, 781 F.2d 319 (2d Cir. 1986), the Second Circuit detailed the various ways in which a supervisory defendant can be personally involved in a constitutional deprivation.  A supervisory official is deemed to have been personally involved if that official "directly participated in the infraction;" if, after learning of a violation through a report or appeal, he failed to remedy the wrong; if "he . . . created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue;" or "if he . . . was grossly negligent in managing subordinates who caused the unlawful condition or event . . . ." *Id.* at 323-24 (citations omitted). Prison supervisors cannot be deemed personally involved based simply on a response to a complaint. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997).  Moreover,

[i]t is now well-settled that the failure of a supervisory official to investigate a letter

> of protest written by an inmate is not sufficient to show personal involvement. *Smart v. Goord,* 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006). The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation. *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007).

*Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008).

"Some courts have held that if the supervisory official acts personally in denying a grievance at various stages of the grievance process, he may be sufficiently involved in failing to remedy the situation." *Id.* (citing *Atkinson v. Selsky*, 03 Civ. 7759, 2004 WL 2319186, *1, 2004 U.S. Dist.LEXIS 20560, *2-4 (S.D.N.Y. Oct. 15, 2004) (denial of grievance sufficient for personal involvement)) (other citation omitted). To determine personal responsibility in such a case, the grievance must allege an "ongoing" constitutional violation that the supervisory official who reviews the grievance can remedy directly. *Hall v. Leclaire,* 06 Civ. 0946, 2007 WL 1470532, *10 (S.D.N.Y. May 22, 2007), *report and recommendation adopted in part and rejected in part on other grounds,* 2007 WL 2815624 (S.D.N.Y. Sept. 28, 2007); *see also Young v. Kihl*, 720 F. Supp. 22, 23 (W.D.N.Y. 1989) ("the wrong . . . [must] have been capable of mitigation at the time the supervisory official was apprised thereof" (citation omitted)). "If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation." *Harnett*, 538 F. Supp. 2d at 524.

Plaintiff names twelve individual defendants who are "supervisory" officials. Six of those defendants – David, Epke, Rapsatt, Taylor, Savage, and Hunt – are present or former superintendents at Greene, Riverview, Gouverneur, Gowanda and Groveland Correctional Facilities.[39] The remaining six are current or former DOCS officials at the Central Office in Albany,

---

[39] The Elmira superintendent is identified as "John Doe." Dkt. No. 1 at p.2.

New York.  Plaintiff names former Commissioner Glenn Goord, Commissioner Brian Fischer, Deputy Commissioner and Chief Medical Officer Lester N. Wright, Director of Correctional Health Services John Sheridan, Director of Dental Services Mary D'Silva, and former Deputy Commissioner Lucien LeClaire.

Defendants seek dismissal of these individuals on the ground that plaintiff has failed to allege that they were "personally involved" in the alleged constitutional violations for purposes of § 1983 liability.  Defs. MOL at pp. 20-23.

Plaintiff opposes the dismissal of these defendants.  Pl. MOL at p. 39.  Plaintiff argues that he has properly pleaded personal involvement of these supervisory defendants on the basis of his allegations that he grieved the many issues raised in the complaint.  *Id*.  Plaintiff further claims that because officials at the facilities where he has been confined "have more than likely conversed with named individual Defendants at the D.O.C.S. Central Office in Albany, NY" these officials were personally involved in the acts of wrongdoing or misconduct alleged.  *Id*. at 15.

With one exception discussed below, plaintiff has not specifically identified the addressees of his letters, the subject matter of his letters and grievances, or the authors of the responses provided.  The Court further notes that as administrators with no medical training, the superintendents are not deemed to have been personally involved in an Eighth Amendment deliberate indifference claim simply by virtue of their having relied on the judgment of the appropriate medical providers.  *See Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (superintendent who overturned claim for outside consultant in reliance on judgment of DOCS regional medical director not personally involved in wrongful action; superintendent was at most negligent).  Moreover, an official may delegate a grievance appeal or letter of complaint to a

subordinate for response without becoming personally involved. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997); *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007). As to these defendants, the Court finds that plaintiff has failed to set forth in his complaint factual allegations sufficient to support a finding that the superintendents were personally involved in the matters complained of for purposes of § 1983 liability.

Plaintiff alleges that he wrote to Riverview Superintendent Rapsatt on July 26, 2007, and again on July 31, 2007, regarding the incident in which plaintiff claims that Correction Officer Bellinger used unnecessary excessive force against him. Dkt. No. 1 at ¶ 816. Plaintiff does not state whether or not he received a response to either of these letters from Superintendent Rapsatt, or one of his subordinates. However, assuming, *arguendo*, that Superintendent Rapsatt wrote to plaintiff responding to his claims against Correction Officer Bellinger, that action without out more, is not sufficient to establish that Superintendent Rapsatt was personally involved in the alleged use of excessive force. As noted above, "[i]f the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation." *Harnett*, 538 F. Supp. 2d at 524.

Plaintiff also alleges that he wrote letters and/or grievances to defendants Wright and D'Silva regarding the medical and dental care, respectively, provided to him. *See* Dkt. No. 1 at ¶¶ 366, 553, 610; Pl. MOL at p. 19. These allegations are conclusory in nature and therefore do not afford a basis upon which the Court could conclude that plaintiff has demonstrated the requisite personal involvement of either defendant. *See Sealey*, 116 F.3d at 51. Moreover, because the complaint as drafted does not state cognizable claims for the violation of plaintiff's Eighth Amendment right to medical and dental care, his claims against Wright and D'Silva also fail. *See*

*Ortiz-Rodriguez v. New York State Dept. of Correctional Services*, 491 F.Supp. 2d 342, 346 (W.D.N.Y. 2007).

In sum, the complaint as drafted is devoid of factual allegations sufficient to show that the supervisory defendants were personally involved in the matters complained of. Accordingly, these defendants are hereby dismissed.

### Q. Official Capacity Claims

The Eleventh Amendment's sovereign immunity doctrine generally bars recovery of money damages from a State entity. *Kentucky v. Graham*, 473 U.S. 159, 167 (1985). Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Graham*, 473 U.S. at 165-66 (citing *Monell v. City of New York Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978)). Considering civil rights actions brought under § 1983, the Supreme Court has held that this federal statute does not provide a right to recover damages from either a State or its officials in their official capacities. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

Plaintiff's complaint seeks relief against the defendants "in their individual and/or official capacities." Dkt. No. 1 at ¶ 3.

Defendants seek dismissal of plaintiff's claims for money damages against the defendants in their official capacities. Defs. Mol. at pp. 32-33. This aspect of defendants' motion is granted.

### R. Dismissal With or Without Prejudice

The Second Circuit has long held that when a *pro se* action is dismissed on the pleadings, the plaintiff should be given the opportunity to amend at least once if the complaint gives "any indication" that a valid claim may be stated. *Frasier v. Gen. Elec. Co.,* 930 F.2d 1004, 1007-09 (2d

Cir. 1991).  The Second Circuit further instructs that a plaintiff must be afforded an opportunity to demonstrate that claims arising out of his confinement at Elmira and Greene were timely filed. *Abbas*, 480 F.3d at 640.

Where a *pro se* complaint is deficient, the court should look closely to determine whether the facts alleged would support a different legal theory from that which plaintiff is claiming and should allow plaintiff to amend his complaint to plead missing elements.  *Frasier*, 930 F.2d at 1008. Although the decision whether to grant leave to amend is within the discretion of the district court, "refusal to grant leave to amend must be based on a valid ground."  *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir. 1990).  Where the possibility exists that the defect can be cured and there is no prejudice to defendants, leave to amend at least once should normally be granted as a matter of course.  *Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir.1991).

Here, with the exception of plaintiff's excessive force claim against C.O. Bellinger, this Court is dismissing the complaint in its entirety for the reasons set forth above.[40]  As to plaintiff's claims sounding in Eighth Amendment medical indifference, due process, interference with mail, violation of medical privacy, and retaliation, however unlikely it may appear, it is possible that plaintiff could amend his complaint to plead missing elements that would state one or more claims cognizable under § 1983.  The same is true for plaintiff's claims against the supervisory defendants. Accordingly, the Court is compelled to dismiss these claims without prejudice and with leave to replead.

Plaintiff's claims asserted against the defendants in their official capacities, as well as his

---

[40]  In light of the Court's rulings set forth above, the Court has not addressed the qualified immunity argument advanced by defendants as an independent ground for dismissal of plaintiff's claims.  *See Saucier v. Katz*, 533 U.S. 194 (2001).

claims predicated on verbal harassment, lost or destroyed personal property, improper cell searches, and false misbehavior reports are dismissed with prejudice, because the problem with each of these claims is "substantive," such that "[b]etter pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III.    Conclusion

WHEREFORE, it is hereby

ORDERED that defendants' motion to dismiss plaintiff's complaint (Dkt. No. 56) is **granted in part and denied in part**; and it is further

ORDERED that with the exception of plaintiff's Eighth Amendment excessive force claim against C.O. Bellinger, all of the claims asserted in the complaint are dismissed.  Plaintiff's official capacity claims, and the claims predicated on verbal harassment, lost or destroyed personal property, improper cell searches, and false misbehavior reports are dismissed with prejudice; the dismissal of plaintiff's other claims is without prejudice; and it is further

ORDERED that all defendants other than C. O. Bellinger are dismissed;[41] and it is further

---

[41]  Because all of plaintiff's claims other than his excessive force claim against C.O. Bellinger have been dismissed, this action is also dismissed as to the unserved defendants.

ORDERED that defendant C.O. Bellinger file an answer to the complaint no later than

October 30, 2010; and it is further


ORDERED that the Clerk serve a copy of this Memorandum-Decision and Order on the

parties.


IT IS SO ORDERED.

Dated: September 29, 2010


Thomas J. McAvoy
Senior, U.S. District Judge

46